771 P.2d 46

Ann M. COLPAERT,
Claimant–Respondent,

v.

LARSON'S, INC., Employer; and Argonaut–Northwest Insurance Company, Surety, Defendants–Respondents,

and

State of Idaho, Industrial Special Indemnity Fund, Defendant–Appellant.

Nos. 16986, 17045.

Supreme Court of Idaho.

March 15, 1989.

Skinner, Fawcett & Mauk, Boise, for defendant-appellant. William L. Mauk argued.

Cooke, Lamanna, Smith & Cogswell, Priest River, for claimant-respondent Colpaert. Nicholas M. Lamanna argued.

Moffatt, Thomas, Barrett & Blanton, Boise, for defendants-respondents Larson's, Inc. and Argonaut–Northwest Ins. Co. John W. Barrett argued.

HUNTLEY, Justice.

Ann Marie Colpaert was born in 1932. She has a ninth grade education. She began working for Larson's, Inc., in Sandpoint in 1979. In 1980 she was promoted to department manager.

On December 10, 1982, claimant tripped and fell at work striking her upper right shoulder when she hit the floor. She suffered a fracture which required surgery. She was released to return to work on March 7, 1983, and did return to work in her supervisory position. Colpaert was discharged from Larson's on April 13, 1983, for reasons unrelated to her injury.

Prior to the accident on December 10, 1982, she was afflicted with a condition known as an ataxia, which attacks the nerves and muscles throughout the body. Both Colpaert and her employer were aware of her condition at the time she was hired. She informed Larson's that she would be unable to walk upstairs or stand on her feet for long periods of time. Larson's hired her with the idea that she could be assisted in various activities by other employees.

Colpaert was rated for permanent physical impairment by Dr. O'Keefe, her treating orthopedic surgeon on June 13, 1983, and was given a permanent physical im-

pairment rating of 15% as compared to the loss of an arm at the shoulder. A compensation agreement was entered into between the parties and approved by the Industrial Commission on July 7, 1983.

Colpaert obtained employment with another employer in July 1983, and continued part-time until February, 1984. By February, 1984, the ataxic condition was progressing. She was treated by James Lea, a neurologist for the condition and has not worked since February, 1984.

After reviewing the medical testimony and the depositions of Colpaert and her employer, Mr. Larson, The Industrial Commission found that Colpaert suffered a total permanent disability. The Commission also found that Colpaert had undergone a change of condition from a 15% impairment rating to a 30% impairment rating. The Commission found that Colpaert was entitled to total temporary disability benefits during the period of December 1982 to March 6, 1983, while she was not employed, in addition to partial temporary disability benefits during the time she worked for an employer subsequent to Larson's, Inc. The Commission assessed against Larson's, Inc. and its surety a partial disability equivalent to 37.5% of the whole man and assessed against the Industrial Special Indemnity Fund (ISIF) the balance of the total permanent disability.

This appeal, a consolidation of appeals brought separately by Larson's and by ISIF, requires us to address the following seven issues:

1. Whether the Industrial Commission erred in finding claimant to be totally and permanently disabled without considering her date of medical stability and by relying on inadmissible hearsay.

2. Whether the Industrial Commission erred in finding that the claimant suffered from a permanent physical impairment which was "manifest" prior to her accident of December 12, 1982.

3. Whether the Industrial Commission erred in holding that the claimant is totally and permanently disabled by reason of the combined effects of both a preexisting impairment and an industrial injury as provided under I.C. § 72–332.

4. Whether the Industrial Commission erred in apportioning disability to ISIF.

5. Whether the Industrial Commission erred in finding that claimant's ataxia constituted a hinderance or obstacle to employment.

6. Whether the Industrial Commission erred in finding that claimant's physical condition had changed resulting in an increase in her permanent physical impairment rating from 15% as compared to the loss of an arm at the shoulder to 30%.

7. Whether the Industrial Commission erred in finding that claimant was entitled to temporary partial disability benefits during the period of July 1983 to February 1984 while the claimant was employed by an employer subsequent to Larson's.

The scope of our review in worker's compensation cases is established both by the Idaho Constitution, art. 5, § 9 and by statute. I.C. §§ 72–724, 72–732. This Court only has the authority to reverse a decision of the Commission when its decisions are not supported by substantial competent evidence, I.C. § 72–732(1), or are not supportable as a matter of law, Idaho Const., art. 5 § 9. *Sykes v. C.P. Clare & Co.*, 100 Idaho 761, 605 P.2d 939 (1980).

On each of the seven issues discussed below ISIF and/or Larson's Surety challenge the findings of the Commission based on a supposed lack of substantial and competent evidence to support them. Our review of the record, including the depositions of the medical experts, the claimant and her employer, Mr. Larson, demonstrates that there is ample substantial and competent evidence sufficient to support the Commission's findings in six of the seven issues raised.

### I.

■ ISIF contends that the Commission erred by relying on alleged hearsay in establishing the existence of Colpaert's permanent and total disability. The Commission relied on a report by Dr. James Lea, a neurologist in Coeur d'Alene, to whom Mrs.

Colpaert was referred by her family doctor in Sandpoint. In his report Dr. Lea wrote "in addition she clearly would have tremendous difficulty in holding down any type of employment and I have suggested to her that she apply to the Social Security Administration for disability." Claimant's Exhibit No. 5, p. 2. The date of Dr. Lea's report was February 17, 1984.

ISIF asserts that the report is hearsay and inadmissible. However, the record contains a stipulation entered into by the attorneys for Colpaert, the employer and surety, and *ISIF* that agreed that this report should be admitted into evidence. Thus, through this stipulation, ISIF has waived any hearsay objection.

■ ISIF also contends that the Commission was compelled by the evidence to find that claimant's impairment as a result of her shoulder injury was medically stable when she was first examined and rated by Dr. O'Keefe, her treating orthopedic surgeon on May 19 and June 13, 1983. ISIF contends that Colpaert's disability must have been determined as of that date due to the alleged stability in Colpaert's shoulder impairment. This contention ignores evidence in the record relied upon by the Commission which established that her condition had not stabilized and in fact had worsened approximately one year later from the time Dr. O'Keefe first offered a 15% impairment rating.

In his deposition Dr. O'Keefe stated the following:

She had returned on March 1, 1984, her condition had undoubtedly worsened as the range of motion was more restricted than it had been on May 19, 1983.

The fact that I didn't put down any numbers on March 1, 1984, led me to believe that when I saw her on March 1 of 1984, range of motion was almost completely restricted. That she had, basically, a stiff shoulder.

Also in evidence was a later impairment rating offered by the surety's doctor, Dr. Burton, resulting from an examination performed on January 2, 1985, which rated her impairment of the shoulder from her injury to the degree of 30% as compared to a loss of the arm at the shoulder.

Thus, there was substantial competent evidence in the record supporting the Commission's finding of Colpaert's total and permanent disability, and that her shoulder had not become medically stable at the date of Dr. O'Keefe's first impairment rating. We affirm the Commission on this issue.

II.

■ ISIF contends that the Commission erred in finding that Colpaert suffered from a permanent physical impairment which was "manifest" prior to her accident of December 12, 1982.

For liability to be imposed upon the ISIF, an employee must have a permanent physical impairment at the time of her industrial accident. I.C. § 72–332(1). ISIF seizes upon an inartfully drawn statute to argue that any "permanent physical impairment" cannot be a progressive condition such as Colpaert's ataxia.

Idaho Code § 72–332(2) discusses "permanent physical impairment" as follows:

" 'Permanent physical impairment' is as defined in § 72–422, Idaho Code...." Idaho Code § 72–422 provides, in relevant part:

"Permanent impairment" is any anatomic or functional abnormality or loss after maximal medical rehabilitation has been achieved and which abnormality or loss, medically, is considered stable or nonprogressive at the time of evaluation.

Thus, ISIF argues that Colpaert's ataxia, being a progressive condition, cannot be, by definition, a permanent physical impairment which will trigger the liability of ISIF.

However, this argument ignores other language in I.C. § 72–332 and the process by which a claimant's permanent physical impairment is determined and rated. I.C. § 72–332(1) provides, in part, "if an employee who has a permanent physical impairment from *any cause or origin*, ..." [emphasis added]. There is no mention of progressive or nonprogressive conditions. Further, § 2 of the statute after referenc-

ing I.C. § 72–422 offers the following proviso:

> provided, however, as used in this section such impairment must be a permanent condition, whether congenital or due to injury or disease, of such seriousness as to constitute a hinderance or obstacle to obtaining employment or to obtaining reemployment if the claimant should become employed.

Likewise, there is no reference here to progressive or nonprogressive conditions.

In addition, the process by which a claimant's permanent physical impairment is rated establishes that the progressiveness of a claimant's preexisting impairment is irrelevant to the process. In this case the Commission relied upon the testimony of Dr. Robert Burton, a neurologist hired by the surety to determine that Colpaert's ataxia produced an impairment of 30% of the whole man prior to December 12, 1982, the date of her shoulder injury. The rating of the permanent physical impairment is made at a point in time just prior to a claimant's industrial accident or injury. In other words, the rating is made, based on expert testimony, *at a specific point in time.* Thus, whether the condition is progressive or not does not impact this rating and the income benefits which flow from it.

■ ISIF also argues that there is no substantial and competent evidence to support the Commission's finding of fact that Colpaert's condition was "manifest" prior to her employment at Larson's, Inc. ISIF again seizes upon the inartfully drawn I.C. § 72–332, which references I.C. § 72–422 as discussed above, to argue that for a condition to be a permanent physical impairment there must be a medical evaluation of the condition after maximal medical rehabilitation has been achieved. In other words, there must be a definitive diagnosis and treatment of the condition.

Significantly, none of our prior cases interpreting the concept "permanent physical impairment" discussed in I.C. § 72–332, mandate the hypertechnical requirement of a definitive medical diagnosis of a claimant's preexisting physical impairment that is documented prior to a claimant's employ-

ment. See *Mapusaga v. Red Lion Riverside Inn,* 113 Idaho 842, 748 P.2d 1372 (1987); *Royce v. Southwest Pipe of Idaho,* 103 Idaho 290, 647 P.2d 746 (1982); *Gugelman v. Pressure Treated Lumber Co.,* 102 Idaho 356, 630 P.2d 148 (1981). We decline to mandate such a requirement today.

Thus, we affirm the Commission's finding that Colpaert's permanent physical impairment was manifest prior to her accident of December 12, 1982 since the finding is based on substantial, competent evidence.

### III.

■ Both ISIF and Larson's surety argue that the Industrial Commission erred by concluding that Colpaert is totally and permanently disabled by reason of the combined effects of both her preexisting impairment and her subsequent injury. Both defendants point to the lack of a specific Commission finding on this issue as fatal to the Commission's conclusion of law.

However, such a finding is fundamental to the Commission's method of apportioning total and permanent disability benefits between the employer and the ISIF. Colpaert's impairment was divided between 18% of the whole man for her shoulder injury and 30% of the whole man for her preexisting ataxia. This apportionment and the finding of total and permanent disability for which the ISIF bears a portion of the burden, is based on evidence that her disability resulted from the combined effects of her preexisting impairment and her subsequent injury.

There is ample substantial and competent evidence in the record demonstrating that her total and permanent disability resulted from the combination of her ataxia and her shoulder injury. Doctor O'Keefe, Colpaert's treating orthopedist, testified that the ataxia limited her response to physical therapy:

> Q. [Mr. Lamanna] And doctor, did that [her ataxia] have any affect in any way on your treatment of Ann Colpaert?

A. Well, it didn't alter the course of treatment. It did have an effect on her response to treatment.

Q. And in what way?

A. Well, she was unable to give her full cooperation to the physical therapist. *And hence, recovery was prolonged and incomplete.* (Emphasis added.)

. . . . .

Q. All right. And doctor, do you have an opinion in terms of reasonable medical probability, that it is more likely than not, the cause of her impairment?

A. *Well, cause of her impairment is a combination of the residuals of the shoulder fracture and the basic underlying progressive neurological disease known as Friedreich's ataxia.* (Emphasis supplied.)

ISIF and the Surety point to deposition testimony of Dr. Burton in support of their position. Dr. Burton testified that Colpaert would have been disabled by the natural progression of her ataxic condition alone even without an intervening industrial injury; that her ataxia did not affect her recovery from the shoulder injury in any way; and that the trauma resulting from her shoulder injury did not aggravate her ataxia. However, while this testimony creates a conflict with that of Dr. O'Keefe quoted above, it does not cancel the effect of the substantial competent evidence by Dr. O'Keefe which supports the Commission's position. Thus, we affirm the Commission on this issue.

### IV.

■ ISIF contends that the Industrial Commission erred in apportioning part of Colpaert's permanent disability to the ISIF. The Commission based its position upon the deposition testimony of Dr. Burton.

The Commission made a specific finding that it accepted Dr. Burton's testimony as credible and persuasive. He testified that prior to the date of Colpaert's accident her permanent impairment, as a result of her ataxic condition, would have been between 25 to 35 percent of the whole man impairment. The Commission accepted the mid-

dle of the range provided by Dr. Burton and found that Colpaert had a 30% of the whole man physical impairment prior to December 12, 1982, the date of her accident. Dr. Burton based his opinion upon Colpaert's long-term and immediate medical histories provided by six M.D.s and her physical therapist. He also conducted his own examination of the claimant. Dr. Burton testified that he had seen a lot of people with ataxic conditions and could extrapolate back to the problems that she had in the past on the basis of the diagnosis of ataxia. Burton Deposition p. 26.

In forming his opinion Dr. Burton used the medical histories provided to him and the narrative accounts of Colpaert's past history of falls related to her difficulty with balance and coordination. He applied this information to a guide provided by the American Medical Association which provided various ranges of impairment of the whole person for persons with neurological conditions that produce symptoms in one's ability to stand and walk. He found her situation to fall within a range of 25 to 35 percent impairment of the whole person.

■ While Dr. Burton was cross-examined by one of ISIF''s attorneys, his testimony was not impeached, and the ISIF provided no controverting expert testimony. As such, the Industrial Commission, which is free to determine the credibility of the witnesses before it, had a right to rely upon the only expert testimony, which was essentially unimpeached, before it. *Pierstorff v. Grays Auto Shop*, 58 Idaho 438, 74 P.2d 171 (1937). We find no error in the Commission having so relied upon Dr. Burton's testimony and affirm the Commission on this issue.

### V.

■ ISIF contends that the Commission erred in finding that Colpaert's ataxia constituted a hinderance or obstacle to employment pursuant to I.C. § 72–332. The statute provides in relevant part:

Permanent physical impairment ... must be a permanent condition, whether congenital or due to injury or disease, of such seriousness as to constitute a hin-

derance or obstacle to obtaining employment or to obtaining reemployment if the claimant should become employed. This shall be interpreted subjectively as to the particular employee involved ...

I.C. § 72–332(2).

The record contains the hearing testimony of Colpaert and Mr. Larson's deposition, which supports the Commission's finding that Colpaert's preexisting impairment constituted a hinderance or obstacle to employment. Colpaert testified as follows:

Q. [Mr. Barrett] Okay. Now, when you went to work for Mr. Larson—and you indicated earlier that so far as standing on stools or elevation from a floor that you had discussed this with him, and he was aware of it?

A. *Yes. I told him that I had a problem.*

Q. Is that when you first went to work for him?

A. No. Before I went to work for him. When I applied for it.

Mr. Larson testified as follows:

Q. [Mr. McPeek] Prior to the decision to hire her, did she express to you that she had any physical problems that might affect her work for you?

A. Yes she did.

Q. What did she indicate to you?

A. She didn't tell me exactly what it was that she had—oh, I don't know how to explain it; *certain things she couldn't do. But she would like to be given the opportunity to see if she could handle the job working here.*

. . . . . .

Q. [W]hat kind of reference could you give for her?

A. I—well, I would have given her a good reference, *except that you would have to put up with her being unable to do certain things as far as traveling and stuff goes. It doesn't bother us here in the store, but it might bother somebody else. You know, we knew she was physically incapable or uncomfortable of handling certain things, so we made adjustments for it. Whether or not another employer would want to make those adjustments or not, I don't know.*

Thus, there was substantial and competent evidence in the record establishing that Colpaert's ataxic condition fulfilled I.C. § 72–332(2) requirements and we affirm the Commission on this issue.

VI.

 Larson's surety contends there is no substantial and competent evidence in the record to support a change of condition relative to Colpaert's shoulder injury resulting in an increase in her permanent physical impairment rating from 15% to 30% as compared to the loss of an arm at the shoulder pursuant to I.C. § 72–719(1)(a). In making its determination the Commission relied upon the deposition testimony of Dr. Keith A. Taylor and Dr. O'Keefe.

The evidence here is essentially the same as that related in Issue No. 1 above. Dr. O'Keefe saw the claimant on May 19, 1983, and June 13, 1983, approximately six months after her accident. At that time he considered her condition stable and rated her physical impairment at 15% compared to a loss of the arm at the shoulder. He then saw her again in March of 1984 and at that time he testified in his deposition that her condition had undoubtedly worsened as the range of motion in her shoulder was much more restricted than it had been on May 19, 1983. Dr. O'Keefe's file memoranda, which documented his examination of the claimant in March of 1984, stated the following:

Ann Colpaert returned to this office on March 1, 1984 because of persistent pain and stiffness in her right shoulder. *This has to be considered a direct extension of her December 13, 1982 injury.*
PRESENT DIAGNOSIS: Adhesive capsulitis, *secondary to injury of 13 December 1982.*

(Emphasis added.) Thus, Dr. O'Keefe's file memoranda established that Colpaert's worsened shoulder condition was directly related to her industrial injury.

As discussed above in Issue No. 1, Dr. Taylor, one of the surety's medical experts,

examined Colpaert in January of 1985 and at this time he rated her impairment at 30% as compared to the loss of her extremity at the shoulder or double that of Dr. O'Keefe in 1983. He expressed the opinion that the difference in rating may have resulted from a difference in opinion between himself and Dr. O'Keefe, rather than a definitive change in the shoulder's condition.

The Commission reviewed this testimony and found that Colpaert's condition had changed based on Dr. O'Keefe's March 1984 observation that her shoulder exhibited increased stiffness, pain and loss of range of motion compared to his May and June 1983 examinations. Dr. O'Keefe's March 1984 file memoranda, mentioned above, directly tied this change in condition to Colpaert's industrial injury.

The Surety argues that Dr. Taylor's rating of 30% impairment compared to a loss of the arm at the shoulder must not be believed because he characterized the rating as perhaps merely a difference of opinion between himself and Dr. O'Keefe. However, the Commission is free to choose which opinion to adopt regarding impairment ratings and chose to rely on Dr. Taylor's 30% impairment rating coming as it did in January of 1985 after Dr. O'Keefe's narrative observations that her shoulder exhibited increased pain, stiffness and loss of range of motion in March of 1984 compared to O'Keefe's May and June 1983 observations.

Based on this record, ample substantial and competent evidence supports the Commission's finding and we affirm the Commission on this issue.

### VII.

Larson's surety contends there is no substantial and competent evidence to support the Commission's finding assessing temporary partial temporary disability benefits during July 1983 to February 1984 while Colpaert was employed by an employer subsequent to Larson's, Inc. We agree.

"Disability" is defined in I.C. § 72–102(8) as follows:

"Disability," for purposes of determining total or partial temporary disability income benefits, *means a decrease in wage earning capacity due to injury or occupational disease,* as such capacity is affected by the medical factor of this co-impairment, and by pertinent non-medical factors as provided in § 72–430, Idaho Code. (Emphasis supplied.)

A key factor in this definition is that the decrease in wage earning capacity must be due to injury or occupational disease. In this case the Commission made no finding that during her employment with Town and Country, following her employment with Larson's, Inc., that Colpaert suffered a decrease in wage earning capacity due to her injury. It is true that she did work part-time for Town and Country. However, the only relevant evidence was Colpaert's hearing testimony wherein she stated that she worked only when Town and Country had a sale and needed extra help. Thus, Colpaert suffered a failure of proof on her claim for partial temporary disability benefits for the period July 1983 to February 1984 while she was employed by Town and Country.

In conclusion we affirm the Commission on all issues except Issue No. VII. On that issue, we reverse. Costs to respondent. No attorney fees awarded.

BAKES and JOHNSON, JJ., and TOWLES, J. Pro Tem., concur.

SHEPARD, C.J., concurs in the result.

BAKES, Justice, concurring specially:

The opinion of the Court is written as though we are reviewing the Commission's original determination in claimant's favor, rather than a decision of the Commission setting aside an award because of a change in the condition caused by the industrial accident. In this case the claimant entered into a compensation agreement which was approved by the Industrial Commission which, as a result, became an award which was res judicata under I.C. § 72–718, and which could only be set aside for a change of condition within five years as provided in I.C. § 72–719. In the absence of the claimant proving some change of her impairment caused by the industrial accident, the agreement and award was res judicata and could not be changed. The appellant ar-

gues that there is no medical testimony to support the Commission's finding that there was a change in her condition increasing the impairment of the industrial injury. Rather, appellant argues the change was caused by claimant's ataxia disease.

After reviewing the testimony of Doctors O'Keefe, Burton and Taylor, I believe there is some evidence from those experts, particularly Dr. O'Keefe, from which the Commission could reasonably have concluded that there was a change in the condition of claimant's impairment, which was caused by the industrial accident, which, although exacerbated by claimant's ataxia disease, was, nevertheless, attributable to the industrial accident. Although that evidence was conflicting and somewhat ambiguous, nevertheless I believe the Commission did not err in concluding that there was a change in condition within the meaning of I.C. § 72–719.

On the other issues raised I would also affirm the Commission's decision.